UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| EUGENE BLACKMON, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-08-273 |
| | § | |
| KUKUA, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Pending before the Court are Defendants Kukua, Livingston, Latorre, E. Garza, and M. Garza's Motion for Summary Judgment, (D.E. 141), and Plaintiff Eugene Blackmon's Motion for Summary Judgment.  (D.E. 142).  For the reasons explained below, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. (D.E. 141.) Specifically, Defendants' Motion (D.E. 141) is GRANTED with respect to Defendants Livingston, Latorre, and Mark Garza.  Said Defendants are dismissed from the lawsuit.  Defendants' Motion (D.E. 141) is DENIED with respect to Defendants Warden Kukua and Assistant Warden Exiquio Garza in their individual capacities.  Plaintiff's claim for injunctive relief is dismissed as moot. Plaintiff's Motion for Summary Judgment (D.E. 142) is DENIED.

### I.      Jurisdiction

The Court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff brings claims under 42 U.S.C. § 1983.

### II.      Background

#### A.      Procedural Background

On August 1, 2008, Plaintiff Eugene Blackmon filed a pro se prisoner civil rights complaint against Defendants Kukua, Livingston, Latorre, Mark Garza and Exiquio Garza.

(D.E. 1.)[1]   Defendant Brad Livingston is the executive director of the Texas Department of Criminal Justice ("TDCJ").  Defendant Diana Kukua is the Head Warden at the Garza East Unit in Beeville, Texas ("Garza East").  Defendant Exiquio Garza is the Assistant Warden at Garza East.  Defendant Mark Garza is the Maintenance Supervisor at Garza East.  Defendant Captain Helen Latorre is a Captain at Garza East. (D.E. 120, p. 2-3.)

The operative complaint alleges that Defendants violated Blackmon's rights under the Eighth and Fourteenth amendments by knowingly subjecting him to inhumane levels of heat during his time in East Garza and by acting with deliberate indifference to Blackmon's health and safety. Blackmon seeks injunctive relief, declaratory relief, compensatory, punitive, and nominal damages for constitutional violations, and attorneys' fees and costs.  (D.E. 120, p. 6.)

Defendants deny that a constitutional violation occurred and assert they are entitled to qualified immunity from suit to the extent they are sued as individuals.  (D.E. 27, p. 4.)

Both parties now seek summary judgment on Plaintiff's claims.  (D.E. 141, D.E. 142.)

**B.     The Conditions in the C-8 Dorm**

Plaintiff Blackmon is a prisoner in the custody of the TDJC.   Blackmon spent approximately sixteen months in 2008 and 2009 incarcerated in the C-8 Dorm at Garza East.  He was transferred to the Terrell Unit in May 2009.  (D.E. 120, p. 2-3.)

Plaintiff contends that from May to October the indoor temperature at Garza East routinely exceeded 90 degrees Fahrenheit for days at a time.  (Id. at 3.)  The summer of 2009 was the first summer indoor temperatures were measured and recorded at Garza East.   At the evidentiary hearing held by this Court on September 2, 2009, the safety officer at Garza East testified as to the average daily temperature of the dorms in the months of June, July and August

---

[1] The complaint was originally filed in the Houston Division of the Southern District of Texas, but was transferred to this Court on August 19, 2008. (D.E. 8.)

of 2009. According to Fisher, the average temperature in June was 88 degrees; the average temperature in July was 91 degrees; and the average temperature in August was 89 degrees. (D.E. 109 (September 2, 2009 evidentiary hearing), p. 7-8.)[2]  On approximately 27 days during these months, the temperature exceeded one hundred degrees.  (Id. at 10-18.)   The hottest recording occurred on July 22, 2009, when the temperature in the dorms was recorded as 104 degrees.  (Id. at 10.)

Until July 2009, there was only one industrial-sized fan per dorm – even though the administration building, control pickets, and other areas where prison employees worked were all air conditioned. (Id. at 27, 50-56.)  The windows in the dorm were sealed shut.  (Id. at 61.)  The main ventilation in the East Garza dorms came from air handlers that brought in air from outside and circulated it through the dorms, but provided no conditioned air.  (Id. at 42.)  Each air handler served two dorms.  (Id. at 39.)  Garza East inmates were not permitted to have personal fans because there were not enough electrical outlets in the dorm for the inmates to use.  There was no water fountain in the dorm.  Ice water was made available three times daily (though the water may have run out on some occasions).  (Id. at 22.)  Offenders were also served iced water and/or beverage at all three meals in the offender dining room. (D.E. 141, Ex. H (Frances affidavit) at 2).  But, according to Blackmon, thirsty prisoners were often forced to drink from one of the restroom sinks.  (D.E. 142, Ex. A (Blackmon Decl.) at ¶19.)  There were eight sinks for up to 54 prisoners, but many were often broken.  (D.E. 120 at 4; D.E. 142, Ex. E (grievance documents) at 1.)

Blackmon contends that prolonged exposure to high temperatures and humidity threatened the physical and mental health of inmates at Garza East. (D.E. 120 at 4-5.)  Blackmon

---

[2] Temperature measurements for half of July and all of August were based on thermometers placed in the central corridors of the dorm housing area.  Measurements for June and the first half of July were based on readings from the TDCJ's number one radio tower, so reflected outdoor air only.  (D.E. 109, at 8.)

himself suffers from hypertension for which he takes medication.  (D.E. 142, Ex. A (Blackmon affidavit), ¶ 25.)  He contends that his age and medical condition put him at acute risk of heat stroke, and that his blood pressure rose and his vision dimmed and became blurry as a result of the heat.  (Id. at ¶¶ 27-29.)

Blackmon further contends that Defendants were well aware of these conditions and did nothing to alleviate them, even after Blackmon wrote several grievances to Defendants regarding the heat conditions and the broken sinks.  (D.E. 120, p. 5-6.)

## C.    Plaintiff's Complaints Regarding Conditions in the C-8 Dorm

The record shows that from June 9, 2008 to September 15, 2008, Blackmon made various complaints about the excessive heat and plumbing problems in the C-8 Dorm to prison staff.  (D.E. 148, Ex. C, Ex. D.)  The parties do not dispute that Blackmon exhausted his administrative remedies.

A handwritten letter, dated June 6, 2008 and addressed to Warden Kukua, states that "everyday at about 8:30 AM the officers in the picket turn on heat coming from some place, causing the heat index in the dorm to become about 108 to 115 [degrees] each day…No one will do anything until it kill or nearly kill someone with bad heart or high blood problems.  Yes we could stand to normal temp from outside, but to add heat that is not need[ed] is … abusiveness. " (D.E. 141, Ex. F.)

Around June 9, 2008, Blackmon filed a Step 1 Grievance in which he complained of the "cruel and unusual punishment because of heat in dorm," stating that "the air conditioning unit is a heat pump and needs to be reversed from winter to summer."  (D.E. 142,  Ex. C, p. 2.)

A Step 1 Grievance Investigative Worksheet, dated June 26, 2008, indicates that Blackmon's complaint was investigated by "K. Segovia," who concluded that "Unit

Administration is doing everything possible about the heat in the dorm.  The air handlers, a fan, and ice is provided daily to all the dorms while the temperatures are also being monitored.  No further action is warranted."  (Id. at 2.)

An Inter-Office Communication from Defendant M. Garza, addressed to "All Offenders" with the subject heading "Air Handlers," dated June 18, 2008, also indicates that Blackmon's complaint regarding the air handler had been investigated.  It states:

> 1. There is nothing wrong with the air handlers for inmate housing.  We will be checking all of them for proper operation.
>
> 2. The heaters are not on and will only turn on if the temp falls below 65 degrees, and there are no other devices that produce heat for housing, and there is no reverse mode from winter to summer.
>
> 3. The air handlers bring in air from outside through it and then into housing, so if the air temperature is 105 degrees then the air going in to your area is going to be the same temp.
>
> 4.  The purge fan is no part of your vent system and it's main p[u]rpose is to remove smoke from the area if they gas in there.  We have them on to help move the air in housing but we are not required to.
>
> 5.  The picket has no control of the system and can not alter any of it.

(D.E. 142, Ex. C at 3.)

The June 28, 2008 response to the June 9 Grievance is signed by Defendant Assistant Warden E. Garza and repeats K. Segovia's conclusion verbatim.  (D.E. 147, Ex. E, p. 2.)

In a second Step 1 Grievance, dated June 25, 2008, Blackmon indicated that the sinks in the C-8 Dorm were "stopped up" and again indicated his belief that the guards were using the air handler to blow hot air into the Dorm, creating "108 to 115 degree of heat to all the dorms." (D.E. 147, Ex. E, p. 2.)

The September 1, 2008 response to the June 25 Grievance, signed by Assistant Warden E. Garza, states: "[a]n investigation revealed that no. 4 sink was open 04-22-08 to replace No. 7

sink work order was open[ed] 06-25-08, no. 6465.   Repairs will be made when parts are received.  No further action required."  (Id. at 7.)  No mention is made of Blackmon's complaints regarding the heat.

Around August 4, 2008, Blackmon filed a Step 2 Grievance form stating he was dissatisfied with the response at Step 1 because the "investigation of un-stopping the sinks was never conducted by the Garza East Maint. Dept."  He repeated his complaint about the head reaching 108 degrees and his theory that heat was being pumped into the dorms by the guards. He also stated: "Plus it [the excessive heat] has cause[d] my high blood pressure to become [?] and high.  The complete month of May I had to check on a blood pressure test machine."  (D.E. 141, Ex. E, p. 15.)

The September 4, 2009 Response to Blackmon's Step 2 Grievance, signed by Defendant Warden Kukua, states:

> Your grievance has been investigated.  The vent control switch for the air handlers is not located in any of the Pickets.  The controls are located in the air handlers on the outside of the dorm and Maintenance maintains and controls the air handlers.  A thermostat controls the heaters and heat does not come on until the temperature is below 65 degrees.  Officers do not control the air handlers. Another work order … has been initiated to repair sinks #4-8.  This issue is considered resolved.  No further action is warranted on this issue.

(D.E. 141, Ex. E, p. 16.)

A September 21, 2008 message from Cheryl Lawson regarding Blackmon's Step 2 Grievance, directed to K. Segovia, indicates that Lawson was investigating Blackmon's grievances regarding the sinks and his allegations regarding the air handler.  (D.E. 142, Ex. D, p. 5).

On September 28, 2008, Defendant M. Garza also wrote to K. Segovia, indicating that the broken sinks were the subject of a work order and that Blackmon's contentions that the

guards were using the air handler to pump heat into the dorms were untrue because the maintenance department controlled the heaters, and there was no vent control switch located in any of the Pickets.  (D.E. 142, Ex. D, p. 6.)

Blackmon also filled out an Offender Request to Official ("I-60 Form") addressed to "Capt. Delatorre."  (D.E. 141, Ex. F.)  In the I-60 Form, Blackmon complained about the 102 degree heat level in C-8 Dorm "because the maintenance department had never reversed the heat pump mode on the air conditioning unit that set that the end of C-5 through 8."  (Id.)  Defendant Latorre attests that she submitted the I-60 Form to the appropriate TDCJ officials, including among others Defendant M. Garza, to investigate the alleged problems.  (D.E. 141, Ex. G (Latorre affidavit) at 1-2.)

## III.   Discussion

### A.     Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The substantive law identifies which facts are material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Judwin Props., Inc., v. U.S. Fire Ins. Co., 973 F.2d 432, 435 (5th Cir. 1992).

On summary judgment, "[t]he moving party has the burden of proving there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law."  Rivera v.

Houston Indep. Sch. Dist., 349 F.3d 244, 246 (5th Cir. 2003); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, "the non-moving party must show that summary judgment is inappropriate by setting forth specific facts showing the existence of a genuine issue concerning every essential component of its case." Rivera, 349 F.3d at 247. The nonmovant "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); see also First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 270 (1968). The nonmovant's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Willis v. Roche Biomedical Labs., Inc., 61 F.3d 313, 315 (5th Cir. 1995); see also Brown v. Houston, 337 F.3d 539, 541 (5th Cir. 2003) (stating that "improbable inferences and unsupported speculation are not sufficient to [avoid] summary judgment").

Summary judgment is not appropriate unless, viewing the evidence in the light most favorable to the non-moving party, no reasonable jury could return a verdict for that party. Rubinstein v. Adm'rs of the Tulane Educ. Fund, 218 F.3d 392, 399 (5th Cir. 2000).

### B.    Analysis

In his Motion for Summary Judgment, Blackmon argues the summary judgment evidence establishes that Defendants violated his Eighth Amendment rights and acted with deliberate indifference to his health and safety.  (D.E. 142.)  In their Motion for Summary Judgment, Defendants argue, in contrast, that: (1) Plaintiff's request for injunctive relief is moot; and that (2) Defendants are entitled to qualified immunity because there is no evidence of a violation of clearly established law or that Defendants' actions were objectively unreasonable in light of the legal standards.  (D.E. 141.)

### 1.    Plaintiff's Request for Declaratory Relief Is Moot

Defendants argue Plaintiff's claim for injunctive relief is moot, given that Plaintiff has been transferred out of Garza East.  (D.E. 141, p. 4.)  Plaintiff objects that his claim is not moot because Defendants have failed to conclusively establish that there is "no reasonable expectation" that the harm to Blackmon may be repeated.  (D.E. 148, p. 15.)  The Court finds Blackmon's request for injunctive relief is moot.

In order for a federal court to hear a case, a real, live controversy must exist at all stages of review.  Defunis v. Odegard, 416 U.S. 312 (1974).  Transfer of a prisoner out of an institution will often render the prisoner's claims for injunctive relief moot.  See, e.g., Cooper v. Sheriff, Lubbock County, Tex., 929 F.2d 1078, 1084 (5th Cir. 1991) (prisoner's transfer to another prison rendered moot his claims for injunctive relief); Hernandez v. Garrison, 916 F.2d 291, 293 (5th Cir. 1990) (prisoner's eighth amendment claims, including overcrowding and denial of medical treatment, were moot since plaintiff had been transferred to another correctional facility and the only remedy the plaintiff sought was a transfer).

In Oliver v. Scott, the Fifth Circuit held that to obtain injunctive relief, a prisoner who has been transferred out of an institution "must show either a 'demonstrated probability' or a 'reasonable expectation' that he would be transferred back to [the institution] or released and reincarcerated there.  At its most lenient, the standard is not 'mathematically precise' and requires only a 'reasonable likelihood' of repetition."  276 F.3d 736, 741 (5th Cir. 2002) (citing Murphy v. Hunt, 455 U.S. 478, 482, 102 S. Ct. 1181, 71 L. Ed. 2d 353 (1982)).[3]

---

[3] Plaintiff cites to Hardwick v. Brinson, where the Fifth Circuit rejected defendant's argument that a prisoner's claim was moot given that the prisoner had been transferred to a different facility. 523 F.2d 798, 800 (5th Cir. 1975).  The court found the inmate's injury was not moot because "counsel for defendants were unable to advise that [the prisoner] would not be returned to [the original prison facility]. Thus the same alleged conduct which appellant complains of may recur. These facts fail to make out a case of mootness." Id. (citing Alabama ex rel. Baxley v. Woody, 473 F.2d 10, 14 (5th Cir. 1973)).  However, in determining whether Defendants have made out their case for mootness, the standards recited in Oliver still apply.

In this case, Blackmon's injury as a result of the allegedly unconstitutional conditions in Garza East has ended because he was transferred out of Garza East, apparently as early as October 21, 2008, and is currently housed at the Terrell Unit, where he was transferred in May 2009. (D.E. 79; D.E. 141, Ex. B at 128, 148.) Blackmon gives no indication that he will be transferred back to Garza East and once again be exposed to excessive heat. Plaintiff points out that a transfer is entirely within the discretion of TDCJ prison officials and that, if they so wished, officials at the Terrell Unit could hypothetically transfer Blackmon back to Garza East.[4] However, this speculation does not amount to a reasonable expectation that Blackmon will be transferred back to Garza East and once again be subjected to excessive heat. Blackmon's claim for declaratory relief is moot. Oliver, 276 F.3d at 741. Blackmon's remedy is limited to damages based on his time incarcerated at Garza East.[5]

## 2. Whether Defendants Violated the Eighth Amendment

Plaintiff moves for summary judgment on the ground that the conditions in the C-8 Dorm during his incarceration constituted a violation of the Eighth Amendment. (D.E. 142.) Defendants respond that the summary judgment evidence does not support an Eighth Amendment violation has occurred. (D.E. 147.)

"[A] violation of the Eighth Amendment's prohibition against cruel and unusual punishment occurs if two requirements – one objective and one subjective – are met." Harris v. Angelina County, Texas, 31 F.3d 331, 334 (5th Cir. 1994) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)). "Under the objective requirement, the deprivation must be so serious as to

---

[4] The TDCJ Offender Orientation Handbook, providing general information and rules of conduct for prisoners held in TDCJ facilities, states that "[o]ffenders do not have a right to choose their unit of assignment. Inter-Unit transfers are based on departmental and offender needs[.]" See TDCJ Offender Orientation Handbook (Nov. 2004), p. 6. Available at http://www.tdcj.state.tx.us/publications/cid/OffendOrientHbkNov04.pdf. The Court may take judicial notice of a fact not subject to reasonable dispute in that it is …(2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Civ. P. 201(b).
[5] As Defendants correctly point out, Blackmon cannot recover damages for the summer of 2009 when he was no longer incarcerated in Garza East. (D.E. 141, p. 12-13.)

'deprive prisoners of the minimal civilized measure of life's necessities,' as when it denies the prisoner some basic human need.  Under the subjective requirement, the court looks to the state of mind of the defendant; deliberate indifference on the part of prison officials will suffice to meet this requirement."  Id. (quoting Wilson v. Seiter, 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991)).

> **a.    Objective Requirement: Extreme Deprivation of Minimal Measure of Life's Necessities**

To establish the objective requirement of an Eighth Amendment violation, Blackmon must show the heat conditions in the C-8 Dorm of Garza East during his incarceration there constituted an "extreme deprivation of any 'minimal civilized measure of life's necessities.'" Gates v. Cook, 376 F.3d 323, 332 (5th Cir. 2004) (quoting Davis v. Scott, 157 F.3d 1003, 1006 (5th Cir 1998)).  "The Supreme Court has noted that 'the length of confinement cannot be ignored…. A filthy, overcrowded cell … might be tolerable for a few days and intolerably cruel for weeks or months.'"  Id. (quoting Hutto v. Finney, 437 U.S. 678, 686-87, 57 L. Ed. 2d 522, 98 S. Ct. 2565 (1978).  To establish a violation, the inmate need not show that death or serious illness has occurred.  Helling v. McKinney, 509 U.S. 25, 32 (1993).

Federal Courts have held that extreme temperatures inside prisons can violate the Eighth Amendment.  For example, in Brock v. Warren County, the district court for the Eastern District of Tennessee found an Eight Amendment violation when ventilation in plaintiff's jail cell was "virtually nonexistent," temperature and humidity in the cell were "extremely high" (sometimes reaching 110 degrees according to a thermometer in the hallway), and, in consequence, the plaintiff died of heat stroke.  713 F. Supp. 238, 241 (E.D. Tenn. 1989).

In Gates v. Cook, the Fifth Circuit upheld the district court's finding, after a jury trial before a magistrate judge, that the heat conditions in a unit of a death row facility in Mississippi

constituted cruel and unusual punishment under the Eighth Amendment.  376 F.3d at 344.  The

Fifth Circuit noted that the trial court had considered a variety of factors, including the high

summer temperatures averaging "in the nineties with high humidity," and the fact that "Death

Row [wa]s primarily not an air-conditioned facility." Id. at 327.  While there were "industrial

type fans in the hallways to help with air circulation," and most inmates actually had smaller fans

and could open their cell windows, "[t]he ventilation [was] inadequate to afford prisoners a

minimal level of comfort during the summer months."  Id.  "The inmates [were] not afforded

extra showers, ice water, or fans if they [didn't] have fans when the heat index [was] 90 or

above.  The heat problem extend[ed] to all of Death Row and possibly throughout [the prison]."

Id.   In addition, the court had found that "[t]he probability of heat-related illness [was] extreme

on Death Row, and [was] dramatically more so for mentally ill inmates who often [did] not take

appropriate behavioral steps to deal with the heat."  Id.

More recently, in Valigura v. Mendoza, et al, 2006 WL 4072061, * 9 (S.D. Tex. Oct. 30,

2006), this Court held in a similar case also involving Garza East that a genuine issue of fact

remained as to whether a prisoner's Eighth Amendment rights were violated, in part because

temperatures in the bunk area reached into the nineties and hundreds due to poor ventilation.  Id.

In affirming the Court's ruling, the Fifth Circuit considered the Magistrate Judge's finding that

temperatures in the cells were "above the eighties and into the hundreds" and stated: "[w]e have

held that temperatures consistently in the nineties without remedial measures, such as fans, ice

water, and showers, sufficiently increase the probability of death and serious illness so as to

violate the Eighth Amendment."  Valigura v. Mendoza, 265 Fed.Appx. 232, 235 (5th Cir. 2008)

(citing Gates, 376 F.3d at 339-40.

On the other hand, courts have found no Eighth Amendment violation despite the uncomfortable temperatures involved.  In Woods v. Edwards, the plaintiff alleged "that his cell was inadequately cooled … [and that his] sinus condition was aggravated by the cell's high temperature."  Woods v. Edwards, 51 F.3d 577, 581 (5th Cir. 1995)  The Fifth Circuit concluded that, "[w]hile the temperature in extended lockdown may be uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the Eighth Amendment."  Id.  However, in Woods, the defendants presented evidence that the portion of the jail housing prisoners in extended lockdown was equipped with fans used to circulate the air.  Id.  Moreover, the plaintiff had "failed to present medical evidence of any significance" to support that the heat negatively impacted his health.  Id.

Upon review of the legal standards and the summary judgment evidence, the Court finds Blackmon has succeeded in raising a genuine issue of fact as to whether the conditions in the C-8 Dorm constituted an "extreme deprivation of any 'minimal civilized measure of life's necessities.'"  Gates, 376 F.3d at 332.  Blackmon has provided sufficient evidence of the extreme temperatures he suffered in the C-8 Dorm.  While Blackmon admits he had no thermometer to measure the temperatures while he was incarcerated, (D.E. 142, Ex. A, ¶8), as recounted above, prison staff did measure the temperatures in the summer of 2009, and found there were approximately 27 days where the heat exceeded one hundred degrees.  (D.E. 109.)

In addition, Blackmon's expert, James Balsamo, has retroactively estimated the temperatures in the C-8 Dorm during the summer of 2008.[6]  Balsamo concludes there were approximately 53 days during the period from July 1, 2008 to September 15, 2008, with a

---

[6] Balsamo calculated these temperatures using outdoor temperatures for those dates, based on the assumption that the air inside the C-8 Dorm was "relatively the same as the air outside, except [with] an increase in temperature inside the C-8 Dorm that is most likely due to metabolic heat being given off from the 50(approximate) inmates in the C-8 Dorm."   He came to this conclusion after recording average temperatures and humidity in the C-8 dorm in September, 2010, and then comparing them to outdoor temperatures.  (D.E. 142, Ex. B, p. 2.)

National Weather Service Heat Index ("HI") of 103 or greater. (D.E. 142, Ex. B, p. 4.) According to a chart published by the National Oceanic and Atmospheric Administration (NOAA), an HI in this range puts humans at a level of risk labeled "Extreme Caution," and can be expected to result in sunstroke, heat cramps, and possible heat exhaustion. (Id.) According to Balsamo, on 11 days in the months of July and August of 2008, the HI in the C-8 Dorm was calculated at 130 or higher – a level sufficient to put inmates in "Extreme Danger" zone on the NOAA's chart, making heat stroke or sunstroke "likely with continued exposure." (Id. at 5, 4.) Balsamo's affidavit is sufficient to raise a genuine issue of fact as to how high the temperatures were in the C-8 Dorm during the summer of 2008, and as to the risk these temperatures posed to Blackmon.[7]

As in Gates, the C-8 Dorm was primarily not an air-conditioned facility. 376 F.3d at 327. The windows in the dorm were sealed shut. (D.E. 142, Ex. J (hearing before Magistrate Judge), p. 61: 16-20). There was only one industrialized fan for the entire C-8 Dorm, (D.E. 142, Ex. A (Blackmon affidavit), ¶ ¶14, 15). Defendants admit that the air handlers at Garza East simply brought in air from outside and circulated it through the dorms, so that the air being circulated through the dorms was at least as high as the ambient temperature outside. (D.E. 142, Ex. D, p. 6.) Blackmon also contends that, because there was no water fountain, thirsty prisoners were

---

[7] Defendants object that the data relied on by Balsamo in estimating the temperatures in the C-8 Dorm – including climatological data collected by the U.S. government – is mere hearsay and should not be considered evidence on summary judgment. (D.E. 147, p. 4.) Rule 56(e) provides that when affidavits are used to support or oppose a summary judgment motion, they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify as to the matters stated therein." Fed. R. Civ. P. Rule 56(e) (emphasis added). However, Balsamo, an expert in environmental health and safety, is designated as Plaintiff's expert witness. (D.E. 139.) His opinions would be admissible evidence at trial pursuant to Fed. R. Evd. 703, which states that "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data [forming the basis of an expert opinion] need not be admissible in evidence for the opinion or inference to be admitted." Fed. R. Evd. 703. Temperature readings from government weather stations are data reasonably relied upon by an expert in Balsamo's field. They would also likely qualify under Fed. R. Evd. 803(8) as "data compilations, in any form, of public offices or agencies, setting forth…matters observed pursuant to duty imposed by law as to which there was a duty to report[.]" As such, Balsamo's affidavit qualifies as evidence to be considered on summary judgment.

forced to drink water from one of the restroom sinks.  (D.E. 142, Ex. A (Blackmon Decl.) at ¶ 19.)  Ice water was apparently provided daily and "water and/or beverage" was available at meal times.  (D.E. 141, Ex. H (Frances affidavit) at 2.)   But Blackmon's complaints, as well as Balsamo's assessment of the general dangers of excessive heat and humidity, indicate that these remedial measures were insufficient to alleviate the heat's effects.

Finally, unlike in Woods, Blackmon has presented some evidence of the negative effects of the heat upon his personal health.  As said, a prisoner is not required to show he is currently suffering severe medical problems caused by the allegedly unconstitutional conditions of his confinement, see Helling, 509 U.S. at 33, but only that he suffered some injury.  See Valigura, 2006 WL 4072061 at *9 (plaintiff's medical records showed his weight fluctuated by approximately 20 pounds during the period complained of.)  Blackmon attests that he suffered from hypertension for which he took medication.  (D.E. 142, Ex. A, ¶ 25).  Blackmon contends that his hypertension worsened during his time at Garza East and that the heat was responsible. (Id. at ¶¶26, 33.)  His Step 2 Grievance complained the excessive heat "cause[d] [his] high blood pressure to become…high" and that "[t]he complete month of May [he] had to check on a blood pressure test machine."  (D.E. 141, Ex. E, p. 15.)   At the evidentiary hearing, Blackmon testified that his blood pressure was monitored for 30 days every morning at 5'oclock.  He further stated that it was "[b]ecause of the heat, excessive heat, it was unstable." (D.E. 109 (evidentiary hearing) at 102.)

Defendants object that Plaintiff's statements do not constitute a viable medical diagnosis, (D.E. 147, p. 3), and that there is no other evidence his high blood pressure resulted from the excessive heat, rather than non-temperature factors.  (D.E. 141, p. 14.)  However, Blackmon has provided additional evidence of the effect the heat had on his condition.  As mentioned, Balsamo

attests to the general health risks of the high heat and humidity in the C-8 Dorm.  In addition, the Practice Manager at the prison Medical Department indicates that during the summer months an "offender" was examined and that "his hypertension medicine was adjusted[,]" though he was not given a diagnosis of extreme heat or exhaustion.  (D.E. 109 (evidentiary hearing), p. 71:17-18).[8]  Blackmon has succeeded in raising a genuine issue of fact as to whether he suffered a heat-related injury as a result of the high temperatures in the C-8 Dorm.

In sum, the summary judgment evidence is sufficient to raise a genuine issue of fact as to whether the conditions in the C-8 Dorm during Blackmon's incarceration in the summer of 2008, including frequent temperatures into the 100's and insufficient ventilation, constituted a denial of the "minimal civilized measure of life's necessities."  Gates, 376 F.3d at 332.

### b.       Subjective Requirement: Deliberate Indifference

To satisfy the second requirement of an Eighth Amendment violation, Blackmon must prove that Defendants showed "a subjective deliberate indifference to…conditions posing a substantial risk of serious harm" to him.  Gates, 376 F.3d at 333  (citing Farmer, 511 U.S. at 833-34).  "[D]eliberate indifference describes a state of mind more blameworthy than negligence…Eighth Amendment liability requires "more than ordinary lack of due care for the prisoner's interests or safety."  Farmer, 511 U.S. at 835 (quoting Whitley v. Albers, 475 U.S. 312, 319, 89 L. Ed. 2d 251, 106 S. Ct. 1078 (1986)).  A prison official must know of and disregard "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including

---

[8] Defendants point out that that this statement does not indicate that Blackmon was the "offender" examined in this instance.  (D.E. 147, p. 3-4.)  Nonetheless, Plaintiff has raised an issue of fact as to whether he was the "offender" examined and as to whether it was excessive heat that caused a deleterious increase in his blood pressure.

inference from circumstantial evidence[.]"   Gates, 376 F.3d at 333 (citing Farmer, 511 U.S. at 842).

Plaintiff contends that Defendants became aware of the extreme heat conditions in the C-8 Dorm when he filed grievances and that Defendants' responses, or lack thereof, amounted to deliberate indifference to his serious medical, health and safety needs.   (D.E. 142, p. 17.) Defendants respond that Plaintiff has failed to even show Defendants had knowledge of the allegedly unconstitutional conditions of confinement, and that, in any case, their responses to Blackmon's complaints did not amount to deliberate indifference.  (D.E. 147, p. 4.)   The Court addresses each of Defendants' objections in turn.

### (1) Defendants' Knowledge of Complaints

The Court finds the summary judgment evidence shows some of the Defendants did have knowledge of Plaintiff's complaints.  Warden Diana Kukua received a letter from Blackmon around June 6, 2008.  (D.E. 141, Ex. F.)  She also signed the response to Blackmon's Step 2 Grievance. (D.E. 141, Ex. E, p. 16.)   Defendant Assistant Warden  E. Garza signed the responses to Blackmon's Step 1 Grievances.  (D.E. 147, Ex. E, p. 2, 7.)  Defendant M. Garza participated in the investigation of the Step 1 Grievance and wrote an inter-office communication addressing Blackmon's complaint regarding the air handler.  (D.E. 142, Ex. C at 3.)  Defendant Captain Latorre attests that she received and read an I-60 Form from Blackmon complaining about the heat.  (D.E. 141, Ex. G (Latorre affidavit) at 1-2.)  Based on this evidence, it is clear that Defendants Warden Kukua, Assistant Warden E. Garza, Maintenance Supervisor M. Garza, and Captain Latorre all had knowledge of Blackmon's complaints.

The summary judgment evidence does not show, however, that Defendant Brad Livingston, Executive Director of the TDCJ, knew about Blackmon's complaints, let alone that

he took any action with respect to them.  The Fifth Circuit has held that supervisory officials are not liable under §1983 unless "there exists either (1) his personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  Thompkins v. Belt, 828 F.2d 298, 303-304 (5th Cir. 1987) (citing Harvey v. Andrist, 754 F.2d 569, 572 (5th Cir. 1985)).  Supervisory liability can also result if supervisory officials implement a policy so deficient that the policy "itself is a repudiation of constitutional rights" and is "the moving force of the constitutional violation."   Grandstaff v. City of Borger, 767 F.2d 161, 169, 170 (5th Cir. 1985) (quoting Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 2037, 56 L. Ed. 2d 611 (1978)).

Under these standards, Plaintiff cannot support an individual claim against Executive Director Livingston based simply on the fact that Blackmon filed grievances with officials at Garza East and that those officials failed to act.  See Kidd v. Livingston, 2010 U.S. Dist. LEXIS 52554, *6-7 (E.D. Tex. May 26, 2010) ("The fact that [defendants] did not take the action on [plaintiff's] grievances which [plaintiff] thought appropriate does not show that a constitutional violation took place. Nor does every letter or grievance written by an inmate to the Executive Director of TDCJ or the Director of the Correctional Institutions Division of TDCJ give rise to personal liability on the part of that official if the letter is not acted upon in the manner which the inmate believes appropriate.")  As such, Defendants' motion for summary judgment with respect to Livingston is granted.

### (2) Adequacy of Defendants' Responses

As to the remaining Defendants, who knew of Blackmon's complaints and took (or failed to take) actions in response to them, the Court must determine whether each Defendant acted

with "subjective deliberate indifference to…conditions posing a substantial risk of serious harm" to Blackmon.  Gates, 376 F.3d at 333

Defendant Latorre was employed as Captain at Garza East.  As discussed above, Latorre received Blackmon's I-60 Form and submitted it to the appropriate TDCJ officials, including Maintenance Supervisor Mark Garza, for further investigation.  (D.E. 142, Ex. G.)  Plaintiff gives no evidence that her duties required more or that this response amounted to deliberate indifference.  As such, Defendants' motion for summary judgment is granted as to Defendant Latorre.

Defendant Mark Garza was the Maintenance Supervisor at Garza East.  The evidence shows that he also acted reasonably in responding to Plaintiff's complaints.  Mark Garza's June 18, 2008 Inter-Office Communication indicates that he investigated Plaintiff's complaints regarding the air handlers.  (D.E. 142, Ex. C at 3.)  Plaintiff has not submitted any evidence to show that Garza's response was not appropriate, let alone that it amounted to deliberate indifference to a risk of harm to Blackmon.  Defendants' motion for summary judgment is granted with respect to Defendant Mark Garza.

As to Defendants Warden Kukua and Assistant Warden E. Garza, however, Plaintiff has succeeded in raising a genuine issue of fact as to whether their acts or omissions amounted to "subjective deliberate indifference" to a serious risk of harm to Blackmon.  Gates, 376 F.3d at 333.  The summary judgment evidence establishes that Warden E. Garza and Warden Kukua had direct, personal involvement in the alleged constitutional deprivation, Thompkins, 828 F.2d at 303-04, or at least that they implemented policies that may have been so deficient that they were themselves a repudiation of Blackmon's constitutional rights.  Grandstaff, 767 F.2d 161 at 169.  According to Garza East's own policies, prisoners' Step 1 Grievances were to be investigated at

the unit, and a response to the grievance signed by the Warden or Assistant Warden was to be returned to the inmate.  (D.E. 142, Ex. K (Response to Interrogatory No. 4) at 2.)[9]  E. Garza's and Kukua's signatures on the responses to Blackmon's grievances indicate that they reviewed and approved of prison staff's investigation of Blackmon's Step 1 and Step 2 Grievances, respectively.  This investigation consisted of issuing work orders to fix the sinks that Blackmon alleged were broken, and investigating Blackmon's allegations that officers were controlling the temperatures from the pickets.  (D.E. 147, Ex. E (grievance documents).)

However, Defendants did not take steps to address Blackmon's complaints of excessive heat.  Blackmon repeatedly stated that temperatures in the C-8 Dorm, both day and night, were over 100 degrees and that this was negatively affecting his health.  Yet Defendants did not seriously investigate these claims or attempt to abate the high temperatures Blackmon complained of.  Assistant Warden E. Garza's June 28, 2008 response to Blackmon's June 9 Step 1 Grievance repeats verbatim K. Segovia's conclusion that "Unit Administration is doing everything possible about the heat in the dorm.  The air handlers, a fan, and ice is provided daily to all the dorms while the temperatures are also being monitored.  No further action is warranted."  (D.E. 147, Ex. E, p. 2.)  The record shows that Warden Kukua had issued a standing order that bags of ice be made available for offenders in the Garza East Unit starting around May or June of 2008 until November 2008.  (D.E. 141, Ex. H (Frances affidavit) at 2.)  Ice water was apparently made available three times daily (though the water may have run out on some occasions).  (D.E. 109, p. 22.)  Offenders were also served "iced water and/or beverage" at all

---

[9] Plaintiff contends Defendants violated this internal grievance process because there "is no indication that the Warden or Assistant Warden ever even saw [Blackmon's June 9, 2009] complaint or signed it as required by the Grievance Procedure."  (D.E. 142, p. 9.)  This is inaccurate.  Assistant Warden E. Garza signed the responses to both Blackmon's June 9, 2008 and his June 25, 2008 Step 1 Grievances regarding the heat and the sinks.  (D.E. 147, Ex. E (portions of Plaintiff's grievance records), at 2, 7.)  Warden Kukua signed the response to Blackmon's Step 2 Grievance.  (D.E. 141, Ex. E, p. 16.)

three meals in the offender dining room.  (D.E. 141, Ex. H (Frances affidavit) at 2.)  They were allowed additional showers to cool off and were allowed to wear shorts.  (D.E. 109, at 23.)  But these policies do not establish that Defendants adequately addressed Blackmon's specific contentions that the temperatures in the C-8 Dorm were excessively high, that the air handlers did nothing to alleviate the heat, and that these conditions presented a threat to his personal health.[10]

Based on this evidence, a fact finder could determine that the Warden's and Assistant Warden's acts or omissions amounted to "subjective deliberate indifference to…conditions posing a substantial risk of serious harm" to Blackmon.  Gates, 376 F.3d at 333.

### 3.    Whether Plaintiff's Claims Are Barred by Qualified Immunity

To the extent Plaintiff sues Defendants for money damages in their official capacities, his claims are barred by the Eleventh Amendment.  Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993).   However, as to Plaintiff's suit against Defendants individually, Plaintiff can withstand Defendants' motion for summary judgment so long as he meets his burden to overcome Defendants' defense of qualified immunity.  See McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002).

The qualified immunity determination involves a two-step analysis.  First, the Court must determine "'whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right.'"  Mace v. City of Palestine,

---

[10] Defendants' responses to Blackmon's subsequent complaints were similarly deficient.  Assistant Warden E. Garza's September 1, 2008 response to Blackmon's second Step 1 Grievance noted that the sinks were being fixed and stated that no further action was required – but made no mention of Blackmon's continued complaints regarding the heat.  (D.E. 147, Ex. E, p. 2.)  Warden Kukua's September 4, 2009 response to Blackmon's Step 2 Grievance noted that Blackmon's claim regarding officers controlling the air handler had been investigated and that officers did not control the handler.  But it did not address Blackmon's general complaint regarding excessive temperatures.  (D.E. 141, Ex. E, p. 16.)

333 F.3d 621, 623 (5th Cir. 2003) (quoting Price v. Roark, 256 F.3d 364, 369 (5th Cir. 2001)). Second, the Court must determine "whether the right was clearly established — that is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " Id. at 624 (quoting Price, 256 F.3d at 369).

### a.       Whether Any Constitutional Right Was Violated

The threshold question in a qualified immunity analysis is whether a constitutional right would have been violated on the facts alleged. Saucier v. Katz, 533 U.S. 194, 200 (2001).  As stated above, Plaintiff has succeeded in showing that genuine issues of fact exist as to whether the heat and humidity conditions in the C-8 Dorm violated his Eighth Amendment Rights under the standards put forth in Gates and Valigura.

### b.       Whether Defendants' Actions Were Objectively Reasonable In Light of Clearly Established Law

The second step of the analysis requires determining whether Defendants' conduct was "objectively reasonable" in light of "clearly established law."  Mace, 333 F.3d at 624.  "To show that a right is clearly established, the plaintiff does not have to refer to precedent that is directly on point, or that declares that the conduct in question is unlawful. Rather, the right is clearly established if based on pre-existing law, the unlawfulness of the conduct in question is apparent." Shipp v. McMahon, 234 F.3d 907 (5th Cir. 2000) (citations omitted).  The contours of the right must be sufficiently clear so that a reasonable official would understand that what he is doing violates that right.  Johnston v. City of Houston, 14 F.3d 1056 (5th Cir. 1994).

In the summer of 2008, it was clearly established law that Plaintiff had a right to be free from cruel and unusual punishment in whatever form.  As of this date, the Fifth Circuit had found that requiring inmates to continually suffer temperatures into the nineties and hundreds was sufficiently serious to implicate the "minimal civilized measure of life's necessities."  See

Gates, 376 F.3d at 339-40; Valigura, 265 Fed. Appx. at 236. In Valigura, the Fifth Circuit held that Eighth Amendment law with respect to similarly excessive temperatures was "clearly established" for purposes of qualified immunity because "the contours of these rights were sufficiently clear at the time of the alleged deprivation[,]" given the Fifth Circuit's ruling in Gates. Valigura, 265 Fed. Appx. at 236. Especially given the Fifth Circuit's subsequent holding in Valigura, the Court finds that, with respect to the Defendants in this case, the law was clearly established.

Whether Defendants are entitled to qualified immunity depends on whether their conduct was objectively reasonable in light of this clearly established law. Mace, 333 F.3d at 624. For the reasons discussed above, Defendants Latorre, M. Garza, and Livingston are entitled to qualified immunity to the extent that they could be found liable under the Eighth Amendment at all. However, as discussed above, Plaintiff has succeeded in demonstrating an issue of fact as to whether Defendants Warden Kukua and Assistant Warden E. Garza's failure to address Blackmon's complaints of excessive heat was "objectively reasonable" in light of the Fifth Circuit's holdings in Gates and Valigura that subjecting incarcerated prisoners to excessive temperatures can violate the Eighth Amendment. Mace, 333 F.3d at 624. Defendants Kukua and E. Garza are not entitled to qualified immunity.

## IV.    Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment (D.E. 142) is DENIED. Defendants' Motion for Summary Judgment (D.E. 141) is GRANTED IN PART and DENIED IN PART. Specifically, Defendants' Motion for Summary Judgment (D.E. 141) is GRANTED with respect to Defendants Livingston, Latorre, and Mark Garza. Said Defendants are hereby dismissed from the lawsuit. Defendants' Motion for Summary Judgment (D.E. 141)

is DENIED with respect to Defendants Warden Kukua and Assistant Warden Exiquio Garza in their individual capacities.  Plaintiff's claim for injunctive relief is dismissed as moot.

     SIGNED and ORDERED this 2nd day of December, 2010.

_____
Janis Graham Jack
United States District Judge